Robert E. Healy, Chief Counsel, of Washington, D. C., for Federal Trade Commission.

Lewis, Garvin & Kelsey, of New York City, for respondent.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

**FEDERAL TRADE COMMISSION v. HOBOKEN WHITE LEAD & COLOR WORKS, Inc.**

Circuit Court of Appeals, Second Circuit.

Nov. 20, 1933.

MANTON, Circuit Judge.

The Federal Trade Commission, acting under the authority of section 5 of the Act of Congress approved September 26, 1914, 38 Stat. 717, 719 (15 USCA § 45), on June 10, 1929, served upon the respondent its order to cease and desist in a proceeding before the Commission entitled "In the Matter of Hoboken White Lead & Color Works, Inc., Docket No. 1565." This proceeding was based upon a complaint, issued February 19, 1929,

pursuant to the statute, which charged the respondent with the practice of misbranding and misrepresenting its paint materials and paint pigments, sold and transported in interstate commerce in violation of the act declaring unfair methods of competition to be unlawful. In the same proceeding, on January 19, 1931, this court, upon consent of the parties, entered the following order:

"It is now further ordered, adjudged and decreed that the respondent, Hoboken White Lead and Color Works, Inc., its officers, agents, representatives, servants, and employees, cease and desist in the course or conduct of the sale of paint material or paint pigment in interstate commerce—

"(1) From using the words 'White Lead,' or word or words of like import, upon the containers of, or with which to brand, label, represent, advertise, or describe, any such paint material or paint pigment which contains less than 50% white lead, lead carbonate, or lead sulphate; and, if and when said paint material or paint pigment is not composed wholly of white lead or of lead carbonate or lead sulphate or of the two in combination, but contains white lead, lead carbonate, or lead sulphate as its principal and predominant ingredient to the extent of not less than 50% by weight of the product, from similarly using said words 'White Lead,' or word or words of like import, unless immediately preceded in equally conspicuous form and color by a word or words clearly indicating that said paint material or paint pigment is not composed wholly of white lead.

"(2) From using the words 'Zinc Lead,' or word or words of like import, upon the containers of, or with which to advertise, brand, label, represent, or describe any such paint material or paint pigment when said product is not in fact zinc lead or is not in fact wholly composed of zinc in combination with lead carbonate or lead sulphate."

Service of a copy of this order was made January 21, 1931.

Since that time, it is charged, the respondent has directly and indirectly caused its paint materials and paint pigments to be sold and transported in interstate commerce, to wit, from the state of New Jersey to the state of New York, under brands and labels in violation of this order. It is established by affidavits that on March 26, May 7, July 3, September 28, and October 15, 1931, it sold and transported in interstate commerce, from New Jersey to New York, to retail paint dealers, in sealed containers, paint materials under various brands and labels affixed by respondent to such cans containing the paint and materials as follows:

One      E L Y S I A N      Gallon

Master Painters

| Contains | NEW PROCESS | Used for |
|---|---|---|
| Zinc White | | Priming & |
| White Lead | ZINC LEAD | Finishing Coats |
| Pure | | On Interior |
| Linseed Oil | Ground | & Exterior |
| | in | Work |

Pure Linseed Oil

The Paint With No Complaint

WHITE

Manufactured by

HoBoKEN WHITE LeAD & CoLoR WoRKS, Inc.

HoBoKEN, N. J.

· · · · · · · ·

HOBOKEN WHITE LEAD

12½ lbs.

New Process

ZINC LEAD

Combination

Ground

in

Pure Linseed Oil

& COLOR WORKS INC.

· · · · · · · ·

New Process

ZINC LEAD

Combination

Ground

in

Pure Linseed Oil.

· · · · · · · ·

It also established that the zinc lead product manufactured by the respondent in New Jersey, and which respondent caused to be marketed to and by the dealers in the state of New York, was a paint material or paint pigment which was not in fact zinc lead, nor was it in any way wholly composed of zinc in combination with lead carbonate or lead sulphite, but consisted principally of barium sulphate, to wit, approximately 80 per cent. of pigment, and contained only about 20 per cent. of zinc with a trace of lead.

On the labeled containers in which white lead was sold the words "White Leader" were

used as a brand, and were printed in large and conspicuous letters. These are words of like import as the words "White Lead." They appear upon such brands and labels in the corresponding space occupied by the words "White Lead" in substantially similar labels and brands used on the containers of paint material which respondent marketed and distributed in commerce prior to the entry of the order of this court. The term "White Leader" was developed by the respondent merely by adding the letters "er" to "White Lead." The words "White Lead" used in the corporate name on the labels were printed in a conspicuous manner in much larger and heavier type than the balance of the words used in the corporate name.

In truth, the paint pigment and paint material as described upon there containers did not contain white lead, lead carbonate, or lead sulphate to the extent of 50 per cent. of the pigment or of the product, nor did it contain white lead, lead carbonate, or lead sulphate as its principal and predominant ingredient to the extent of not less than 50 per cent. of the weight of the product, but contained principally barium sulphate, to wit, approximately 61 per cent. of the pigment, and lithopone, to wit, approximately 27 per cent. of the pigment, with only a trace of lead and the content of zinc to the extent of approximately 10 per cent. of the pigment. Such product is of substantially the same composition as the paint pigment and paint material marketed and distributed by the respondent in interstate commerce under the term "White Lead" prior to the entry and service of the order to cease and desist. The lithopone is a compound ingredient consisting of approximately 30 per cent. zinc sulphide and approximately 70 per cent. barium sulphate.

After the entry of the order to cease and desist, the respondent organized the Hoboken White Lead & Color Works, Inc., a corporation under the laws of the state of New York, while the respondent was a corporation organized under the laws of New Jersey. The paint was manufactured by the New Jersey corporation, sent to the New York corporation, which did not manufacture, but it placed the labels upon the containers, and the paint material was sent forward to the customers in the same sealed container. The stockholders and officers of the New York corporation were the same as those of the New Jersey corporation. Its sole function was to deliver to retail merchants, under these false and fraudulent labels prohibited by the court's decree, the kind of paint referred to in that decree.

To violate the order of this court, it is essential that it be established that the sale of the paint material be found to be in interstate commerce. Soliciting agents, in the name of the New York corporation, took orders from retail dealers in New York for respondent's products which it delivered to the New York corporation by interstate transportation from its manufacturing plant in New Jersey, and the New York corporation delivered the product to the several retail dealers from whom orders had been procured. The respondent's agents, officers, and employees, who organized the New York corporation and attempted to carry on the business in the manner described, are expressly enjoined by this court along with the respondent corporation. The respondent may act only through its officers, agents, and employees. Their acts are its acts when done in furtherance of respondent's business.

The answer filed expressly admits that the New York corporation was created by respondent's officers to deliver respondent's product, which respondent could not itself deliver in New York under the label "Zinc Lead," without violating the order of the court. It is apparent that the respondent transports its containers and false labels separately to the office of its subsidiary in New York, there to be attached, and by this means they furnish to retailers a quality of merchandise which deceives the purchasing public. It is no defense that the interstate sale and delivery of respondent's produce under these unlawful labels is accomplished by means of a new corporation which the respondent created for that purpose. Prang Co. v. American Crayon Co., 58 F.(2d) 715 (C. C. A. 3).

It is likewise clear that the respondent sells and delivers its product to the New York corporation in interstate commerce. The New York corporation is used merely as an instrumentality of the respondent, and makes delivery for it. The sales and the delivery of the product by the respondent to the dealers constituted interstate commerce. The paint thus sold and transported is in a continuous process of interstate shipment from the time it leaves the respondent's factory until it reaches the several purchasers. An intervening sale would not terminate the interstate character of the transaction. Greater N. Y. Live Poultry Chamber of Commerce v. United States, 47 F.(2d) 156 (C. C. A. 2); Binderup v. Pathe Exchange, 263 U. S. 291, 309, 44 S. Ct. 96, 68 L. Ed. 308. Nor did a temporary stoppage in the New York corporation's

554

place of business, and the subsequent transfer to other trucks for transportation, change the character of that interstate commerce. Hughes Bros. Timber Co. v. Minnesota, 272 U. S. 469, 47 S. Ct. 170, 71 L. Ed. 359, Wagner v. Covington, 251 U. S. 95, 104, 40 S. Ct. 93, 64 L. Ed. 157, 168.

■ Moreover, a device created for the purpose of changing transportation from interstate to intrastate commerce, between the factory of the respondent and the place of business of its several purchasers, in an effort to evade the terms of the decree of this court, is legally ineffectual for that purpose. Baltimore & O. S. W. Ry. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189.

■■ The disobedience of the decree of this court thus entered constitutes a contempt with the inherent power of the court to administer punishment. The decree of this court bound the respondent perpetually in relation to the prohibited conduct not only within this circuit, but throughout the United States. Leman Adm'r v. Krentler-Arnold Hinge Last Co., 284 U. S. 451, 52 S. Ct. 238, 76 L. Ed. 389. It is guilty of contempt by its willful conduct. A fine of $500 is accordingly imposed.

Motion granted.