## FEDERAL TRADE COMMISSION v. WALLACE.
### No. 382.

Circuit Court of Appeals, Eighth Circuit.
Feb. 9, 1935.

Martin A. Morrison, Asst. Chief Counsel, Federal Trade Commission, of Washington, D. C. (W. T. Kelley, Chief Counsel, Federal Trade Commission, of Washington, D. C., on the brief), for petitioner.

William R. Schneider, of St. Louis, Mo., for respondent.

Before STONE, GARDNER, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

The complaint of the Federal Trade Commission was filed in January, 1924, and March 21, 1924, was the date fixed when a hearing would begin. The complaint was based upon section 5 of the Federal Trade Commission Act (15 USCA § 45). It was entitled, "In the Matter of Missouri State Retail Coal Merchants' Association, also Known as the Mid-West Retail Coal Association, its officers and Members," and nineteen of such officers and directors were named as respondents in both their individual and official capacities. In the complaint various acts constituting methods of unfair competition in commerce were charged. It is stated that the above-named association was composed of retail dealers in coal, having their respective places of business in the states of Missouri, Arkansas, and Illinois. It was incorporated under the laws of Missouri and its headquarters was in St. Louis in said state. Its constitution adopted the following definition of qualification for membership: "Any individual, firm or corporation regularly engaged in the business of selling coal, coke, or other fuel with facilities and stock sufficient to meet the reasonable demand of the public in his community."

Only retail dealers qualified under this definition were eligible to become, or be received as, members, and such were designated by respondents to the complaint as regular or legitimate dealers. All dealers or other persons, including individuals, firms, corporations, farm clubs, co-operative societies, church organizations, etc., who sell coal at retail, and who do not fulfill all the qualifications and requirements of said definition, are by these respondents denominated irregular or illegitimate dealers and are refused membership in said association.

All dealers contemplated, both regular and so-called irregular, located in the states aforesaid, purchase their coal from producers and wholesalers of coal, many of whom have their mines and places of business in states other than those in which the dealer-purchasers are located; and the coal so purchased is shipped by the producers and wholesalers from their respective locations through other states of the United States to the locations of the purchasers in said states of Missouri, Arkansas, and Illinois. It was charged that such respondent dealers had co-operated together to prevent so-called irregular dealers from obtaining coal from producers or wholesale dealers. This was accomplished by obtaining the names of such so-called irregular dealers doing business in the communities in which member dealers were located, and in publishing their names in a monthly trade journal of said association which circulates among association members and the producers and wholesalers who supply such members with coal. By articles and editorials in this trade journal and otherwise the association and its members sought to prevent producers and wholesalers from selling coal to so-called irregular dealers, threatening to boycott such producers and wholesalers unless they restricted their sales to association members, publishing and circulating comment derogatory to such so-called irregular dealers and to their credit, and applying to them denunciatory and abusive terms.

Inasmuch as the association members are large purchasers of coal at wholesale in their respective communities, it was charged that their threats and practices of boycott and intimidation had resulted in coercing and compelling many of such vendors of coal at wholesale to refuse to supply so-called irregular dealers with coal, with the result that competition in the distribution and sale of coal in said trade territory had been and then was unduly obstructed and hindered, and "consumers therein had been and are deprived of the advantages in price and otherwise which they would obtain from the natural flow of commerce in coal under conditions of free competition."

The foregoing statement of allegations, in some instances taken bodily from the complaint, is deemed sufficiently ample to disclose the nature of the charge brought by the Federal Trade Commission empowered and directed by the Federal Trade Commission Act "to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the Acts to regulate commerce, from using unfair methods of competition in commerce." (15 USCA § 45.)

After an extended hearing, the commission, May 15, 1926, made detailed findings of fact in writing which fully supported and confirmed the charges laid in the complaint, and on the same day issued and caused to be served an order requiring the persons therein named to cease and desist from using such methods of competition. It was thereby ordered that the respondents named, their agents, representatives, and employees do "cease and desist from undertaking and co-operating together and acting in concert in hindering and preventing, or attempting to hinder and to prevent, directly or indirectly, the purchase and sale of coal in interstate commerce by and between producers, jobbers, and wholesale dealers therein, and individuals, firms, corporations, farm clubs, cooperative societies, church organizations or others, consumers of coal or dealers therein, by the following methods:

"1. Arbitrarily classifying sellers and purchasers of coal and shipments thereof as 'Snowbird' shippers, 'Snowbirds,' and 'Snowbird' shipments, respectively, or by any similar or other terms because of or according to the extent or degree of equipment owned by the said purchasers or employed by them in the sale, movement, or distribution of coal, or causing any such classification to be published in any trade paper, or other publication, or to be communicated to others or among themselves, in that or any other manner.

"2. Designating or causing to be designated, in articles or editorials in any trade paper or other publication, or in any other manner, or by any other means, any individual, firm, corporation, or association, or groups thereof, as the vendor or purchaser of coal, or their shipments of coal by using or causing to be used denunciatory, scurrilous, abusive, or derogatory language of and concerning them or either of them.

"3. Soliciting or receiving between or among themselves or with others and/or circulating between and among themselves or with others communications or reports, either printed, written, or verbal, having the purpose, tendency or the effect of inducing, coercing, or compelling producers, jobbers, or wholesale dealers in coal, their agents or their brokers, directly or indirectly, to refuse to deal with or to sell coal to any person, firm, corporation, or association.

"4. Threatening with loss of patronage or custom, any producer, jobber, or wholesale dealer in coal, or his agent or broker, for selling or agreeing to sell to any person, firm, corporation, or association, or from persuading any such producer, jobber, or wholesale dealer in coal not to sell coal to any person, firm, corporation, or association."

The commission has applied to this court for the enforcement of this order.

In their answers filed to the complaint the respondents, with the exception of E. J. Wallace, in general disclaimed any personal participation in the activities of the Mid-West Retail Coal Association, but stated that the affairs of the organization were under the guidance of Mr. Wallace, their commissioner, who was given unlimited authority to use his own judgment in all matters. In view of the intimation in the answer and application of respondent Wallace to set aside and have denied the commission's application for the enforcement of its cease and desist order, that the Mid-West Retail Coal Association has been dissolved, and that its activities and those of its directors have ceased, the order of enforcement is now asked against Wallace as sole respondent in this proceeding.

In his said answer respondent Wallace does not deny that the findings are supported by substantial evidence, nor the allegation in the commission's petition that he has

failed and neglected to obey the cease and desist order. He seeks rather to justify the activities charged and found, and to challenge the sufficiency of the findings to support the cease and desist order. The specifications of his challenge are in substance the following:

1. That the activities of the respondent and his corespondents, prior to the filing of the complaint by the commission, were directed solely toward the protection of the coal consuming public and the established legitimate coal dealers.

2. That the activities of the respondent and his corespondents are in accord with the coal code established under the National Industrial Recovery Act; and that the present proceeding is in conflict therewith.

3. Respondent is not, and has not been, doing unlawful acts nor threatening so to do.

4. The respondent cannot alone "co-operate and act in concert" in violation of the language of the cease and desist order.

■ It will be seen that this answer of the respondent Wallace does not traverse the findings of the commission. It amounts rather to a demurrer to those findings, their sufficiency to support the conclusion reached, and the propriety and effectiveness of the cease and desist order as a result of such findings and conclusion. In such case, we have no occasion to review the evidence, and the findings must be accepted as conclusive. It will be presumed that they are supported by substantial testimony. Arkansas Wholesale Grocers' Association v. Federal Trade Commission (C. C. A. 8) 18 F.(2d) 866; Federal Trade Commission v. Inecto, Inc. (C. C. A. 2) 70 F.(2d) 370; Federal Trade Commission v. Pacific States Paper Trade Association, 273 U. S. 52, 63, 47 S. Ct. 255, 71 L. Ed. 534.

In the brief of respondent the points specified to be argued are:

1. Do the admitted activities of the respondent and his former associates constitute unfair competition as the courts interpret that term under the Federal Trade Commission Act?

2. Is it possible for the respondent alone to co-operate and act in concert, and, if not, should this court order him to cease doing the impossible?

3. The order sought to be enforced is, in substantial part, in conflict with the National Industrial Recovery Act.

■ There can be little doubt that a combination among retail dealers to prevent competitors from engaging in business, and from procuring the commodities essential to the conduct of such business, by means of threats and intimidation, is a violation of the letter and spirit of section 5 of the Federal Trade Commission Act (15 USCA § 45), provided interstate commerce is thereby affected. Arkansas Wholesale Grocers' Association v. Federal Trade Commission, supra; National Harness Mfrs' Association v. Federal Trade Commission (C. C. A. 6) 268 F. 705, 712; Wholesale Grocers' Association v. Federal Trade Commission (C. C. A. 5) 277 F. 657; Southern Hardware Jobbers' Association v. Federal Trade Commission (C. C. A. 5) 290 F. 773, 779; Eastern States Lumber Association v. United States, 234 U. S. 600, 614, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788.

Interstate commerce is affected because purchases are made largely from producers and wholesalers in such commerce. Crenshaw v. Arkansas, 227 U. S. 389, 401, 33 S. Ct. 294, 57 L. Ed. 565; Stewart v. People of State of Michigan, 232 U. S. 665, 669, 34 S. Ct. 476, 58 L. Ed. 786; Dahnke-Walker Co. v. Bondurant, 257 U. S. 282, 291, 42 S. Ct. 106, 66 L. Ed. 239; Weeks v. United States, 245 U. S. 618, 622, 38 S. Ct. 219, 62 L. Ed. 513. Such practices restrain competition and tend to monopoly, and, as such, are in violation of section 5 of the Act. Eastern States Lumber Association v. United States, supra.

"It is as unlawful to prevent a person from engaging in business as it is to drive a person out of business." Thomsen v. Union Castle Mail S. S. Co. (C. C. A. 2) 166 F. 251, 253; United States v. Patterson (C. C.) 59 F. 280, 283; Federal Trade Commission v. Klesner, 280 U. S. 19, 28, 50 S. Ct. 1, 74 L. Ed. 138, 68 A. L. R. 838.

■ It is enough that there be present or potential substantial competition, which is "shown by proof or appears by necessary inference, to have been injured, or to be clearly threatened with injury to a substantial extent, by the use of the unfair methods complained of." Federal Trade Commission v. Raladam Co., 283 U. S. 643, 646, 647, 51 S. Ct. 587, 75 L. Ed. 1324, 79 A. L. R. 1191. Such methods are unfair if they "tend to the substantial injury of the public by restricting competition in interstate trade and 'the common liberty to engage therein.'" Federal Trade Commission v. Raladam Co., supra.

■ In paragraphs numbered 1 and 2 of his answer respondent Wallace claims that his activities and those of his corespondents were directed toward bringing about prosecution of coal dealers who sell at short weight, misrepresent their coal, and overcharge consumers; and that these activities are in harmony and co-operation with the National Industrial Recovery Act (15 US CA § 701 et seq.) and the coal code established under it. He has filed as an exhibit a copy of that code. It is, perhaps, sufficient to point out that if any dealers, so-called regular or irregular, have been guilty of the practices intimated, sufficient provisions exist under the general law, if not under the code itself, to abate such practices without exclusion from business of all operators who do not conform to the definition of eligibility to regular membership prescribed by respondent and his associates. It is not a prerogative of private parties to act as self-constituted censors of business ethics, to install themselves as judges and guardians of the public welfare, and to enforce by drastic and restrictive measures their conceptions thus formed.

In the consideration of this case we have examined the code exhibited by respondent, and we find in it nothing to support his contention that the action of the Federal Trade Commission upon the facts found is in conflict with the aims and purposes of the National Industrial Recovery Act. Respondent does not and could not claim to act under the authority of that code. Such powers purport to be exercised, if at all, by the National and Divisional Code Authorities created under the National Recovery Act. In the terms of the letter transmitting this code to the President for his approval, it is expressly stated: "Said Code is well designed to promote the policies and purposes of Title I of the National Industrial Recovery Act, including removal of obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof," and "is not designed to and will not permit monopolies or monopolistic practices. The Code is not designed to and will not eliminate or oppress small enterprises, and will not operate to discriminate against them."

For the purposes of facilitating administration, members of the Retail Solid Fuel Industry are defined and classified as follows:

"(a) An equipped retailer shall mean a person regularly engaged in the retail solid fuel industry who maintains properly equipped unloading storage, and service facilities reasonably commensurate with the nature of the business, equipped with and using wagon or truck scale of sufficient size and capacity and maintained in condition accurately to weigh the maximum gross load for which it is utilized, maintaining an office accessible to the public with a competent person on duty and who carries a sufficient stock of solid fuel at all times for the purpose of retailing and not for his own consumption to supply the general requirements of the community; provided however, that in any retail trade area where solid fuel mines, docks, coke or briquetting plants, or wholesale yards are located so as to insure a continuous supply, a member of the industry dependent upon and using such facilities exclusively shall be included in this definition notwithstanding the fact that such member does not maintain his own storage, loading and scale facilities provided his facilities conform in every other respect to the requirements above.

"(b) An unequipped retailer shall mean all other persons engaged in the retail solid fuel industry not meeting the requirements of an equipped retailer."

It thus appears that the code recognizes as an unequipped retailer those defined by respondent and his associates as illegitimate dealers. It goes still farther and provides that "any member of the industry, not maintaining premises in the retail trade area served by such member, shall post prices, terms and conditions of sale on each vehicle." Such dealers are legitimate competitors in the trade, although maintaining no such formal establishment and equipment upon which respondent insists. Under the title "Unfair Practices" we find this: "The defamation of competitors by falsely imputing to them dishonorable conduct, inability to perform contracts, questionable credit standing, or by other false representations, or the false disparagement of the grade or quality of their goods, with the tendency and capacity to mislead or deceive purchasers or prospective purchasers, is a violation of this Code."

Finally, article VIII under the heading "Monopolistic Practices" reads thus: "No provision of this Code shall be so applied as to permit monopolies or monopolistic practices, or to eliminate, oppress, or discriminate against small enterprises."

■ It would be difficult to frame language more descriptive of the practices condemned

by the Federal Trade Commission in the order sought to be enforced. Respondent receives no support in his appeal to the National Industrial Recovery Act. Nor do we find any impairment of the Federal Trade Commission Act under which the commission is seeking to prevent any obstruction, through unfair methods of competition, to the free and natural flow of trade in the channels of interstate commerce. Respondent says that he ceased his "admitted activities" at once when this cause was filed. Abandonment will not be presumed and, even though pleaded and presently effective, is no bar to the entry of an enforcement order. A bill not specifically denied is a basis for a decree limited to future acts. There is no guaranty that the acts complained of will not be renewed if the relief prayed is denied. Arkansas Wholesale Grocers' Association v. Federal Trade Commission, supra; Swift & Co. v. United States, 276 U. S. 311, 48 S. Ct. 311, 72 L. Ed. 587; Local 167, International Brotherhood of Teamsters, etc., v. United States, 291 U. S. 293, 299, 54 S. Ct. 396, 78 L. Ed. 804. If, as here, it is fairly apparent that the order has not been obeyed, and the answer of the respondent fails to assert compliance, a decree of enforcement is justified. Federal Trade Commission v. Morrissey (C. C. A. 7) 47 F. (2d) 101.

 The commission has elected to ask a decree of enforcement only against Wallace of the respondents made parties in the complaint. He contends that it is impossible for him alone to act in concert, and, therefore, to respond to the decree if entered. In this he misconceives the scope of the enforcement decree prayed. It orders that "the respondent Wallace, his agents, representatives, and employees, do cease and desist from undertaking and co-operating with his corespondents herein or with another or others in hindering and preventing, or attempting to hinder and to prevent, directly or indirectly, the purchase and sale of coal in interstate commerce by and between producers, jobbers and wholesale dealers there-in, and individuals, firms, corporations, farm clubs, co-operative societies, church organizations or others, consumers of coal or dealers therein, by the following methods:" Then follows a recital of the methods employed as set out in the cease and desist order. Wallace was thus selected presumably because, from the record generally and from his own answer and those of his associates, he was clothed with full authority to act for himself and the others in accordance with his own judgment. It was he who caused to be done the acts of which the commission complains. It seems clear, therefore, that the result aimed at in this proceeding will be attained if this respondent is prohibited from acting not only as an individual, but also in concert with his former associates or with others in employing the unfair methods recited.

The act requires this court, upon application for enforcement, to enter a decree affirming, modifying, or setting aside the order as the situation may warrant. In case of affirmance or modification that decree should be broad enough to give effective relief and to prevent evasion. Local 167, International Brotherhood of Teamsters, etc., v. United States, 291 U. S. 293, 299, 54 S. Ct. 396, 78 L. Ed. 804.

The respondent was made a party individually and as a commissioner of the Mid-West Retail Coal Association. Accordingly to conform to the proofs, to give effective relief, and to prevent evasion, the order to cease and desist will be modified by inserting the words "or as individuals" in the opening clause thereof, which will then read as follows: "Cease and desist from undertaking and co-operating together and acting in concert, or as individuals, in hindering and preventing," etc.

The order to cease and desist issued by the Federal Trade Commission under date of May 15, 1926, as thus modified is affirmed, and a decree of enforcement will be entered in accordance with the terms thereof. It is so ordered.